Ben Shwayder v. Commissioner.
Shwayder v. Commissioner
Docket No. 4462.
United States Tax Court
1947 Tax Ct. Memo LEXIS 260; 6 T.C.M. (CCH) 362; T.C.M. (RIA) 47082; March 31, 1947
Edgar W. Pugh, Esq., 3353 Penobscot Bldg., Detroit 26, Mich., for the petitioner. William F. Robinson, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined a deficiency of $2,668.83 in income tax for the year 1941. The only question is whether petitioner is taxable on the entire amount of dividends on certain stock, as the respondent has determined. Petitioner contends that one-half of the dividends, $5,000, is taxable to his wife. The petitioner filed his return with the collector for the district of Michigan. Findings of Fact Petitioner was married in 1921. His wife is Reva C. Shwayder. They reside in Detroit, Michigan, where they have lived since 1928. Petitioner is *261 an officer and stockholder of Shwayder Bros., Inc., formerly the Shwayder Trunk Manufacturing Co., which was founded in 1910 by two brothers of petitioner. In 1941, the Company's stock was owned by about twenty stockholders, all of whom were members of the Shwayder family. The officers were as follows: Jesse Shwayder, president; Mark Shwayder, vice-president; Maurice B. Shwayder, secretary; Ben Shwayder (petitioner), treasurer; and King D. Shwayder. Petitioner was one of the five directors of the Company. The main office of the Company is in Denver, Colorado, and there is a branch factory located in Ecorse, near Detroit. Petitioner worked for the Company in Denver, while he was still attending school. After leaving school he went into business for himself. In 1924, he liquidated his own business and returned to the Company where he was employed at a salary. In 1928, petitioner went to Detroit to manage the factory at Ecorse. In 1924, Jesse and Maurice Shwayder each agreed to sell some of their stock to petitioner in order to induce him to work in the business. Petitioner was to acquire a total of 50 shares of common stock, 37 1/2 shares from Jesse and 12 1/2 shares from Maurice. *262 At that time the Company's outstanding stock amounted to 500 shares, so that the stock which petitioner was to acquire represented 10 per cent of all of the stock. The agreement relating to the acquisition of 50 shares and the method of pament for that stock will be set forth hereinafter. Eventually a certificate of shares of stock was issued in the name of petitioner but the certificate was for 5,000 shares rather than 50 shares because just prior to the issuance of the certificate a stock dividend was declared of 100 shares for one share. The stock dividend increased the outstanding stock of the Company in January, 1932 from 500 to 50,000 common shares. The stock dividend resulted in additions to the 50 shares. The first certificate to be issued as a result of the 1924 agreement was certificate #3, issued on January 2, 1932, in the name of petitioner. In 1940, another stock dividend was declared on the basis of 10 shares for one share. The outstanding stock of the Company was thereby increased to 500,000 shares. A new certificate, #13, for 50,000 shares was issued on or about December 31, 1940, in the name of the petitioner. New certificate #13 replaced old certificate #3. The *263 50,000 shares of stock issued in December, 1940 represented one-tenth of all of the outstanding common stock. On December 19, 1941, a special meeting of the board of directors was held at the office of the Company. All the directors were present. A resolution was adopted at this meeting that a cash dividend in the sum of $100,000 should be paid to stockholders. Petitioner was the record owner of 50,000 shares of stock on the date the dividend for 1941 was declared. He had been the record owner of the original block of 5,000 shares. He remained the record owner of stock until March 4, 1943. Petitioner wrote a letter dated December 20, 1941, to Maurice Shwayder, in which he requested the Company to issue a check payable to Mrs. Reva Shwayder for one-half of the 1941 dividend. Petitioner stated in the letter "my wife is one-half owner of my common stock." Thereafter, on December 22, 1941, two checks for $5,000 each were issued, one payable to petitioner, and one payable to Reva C. Shwayder. Reva Shwayder opened a separate bank account in 1940. She deposited the check of December 22, 1941, for $5,000, in that account. On March 10, 1943, new certificates #19 and #20 were issued *264 for 25,000 shares of stock, each, in the names of Ben Shwayder and Reva Shwayder, respectively. These two certificates took the place of certificate #13 for 50,000 shares. The certificate delivered in Reva Shwayder's name was never delivered to her personally. She never saw the certificate until May 15, 1945. The agreement among Jesse, Maurice and Ben Shwayder, which was made in 1924, was made under the following circumstances and involved the giving of a note to Jesse and a note to Maurice, as follows: The Company considered petitioner a promising and valuable person in 1923. In order to induce him to give up a business which he had started and to come to work for the Company, a plan was made whereby Jesse and Maurice would sell part of their stock to petitioner, as set forth above. Jesse and Maurice made such agreement with petitioner in 1924. The only reason the stock was sold to petitioner was to secure his services and to make him part of the organization. The sale of the stock to petitioner would give him a financial interest in the Company. The only persons who were present when the agreement was made were Jesse, Maurice and petitioner. Petitioner executed a demand note *265 dated January 31, 1924, made payable to Jesse in the amount of $13,126.88, and another demand note bearing the same date made payable to Maurice in the amount of $4,375.62. Both notes bore 8 per cent interest. Reva C. Shwayder also signed both notes. The notes were given in payment for the stock sold by Jesse and Maurice. The total amount of the two notes was $17,502.50. Petitioner's wife was a minor at the time she signed the notes. She had no property in her own name at that time. The notes of January 31, 1924, were paid by debits to petitioner's personal ledger account on the books of the Company and by corresponding credits to the personal accounts of Jesse and Maurice. The entries so made represented the application of salary and bonus payments owing to petitioner by the Company to the payment of the notes, and, also, dividends declared on the 50 shares of stock to and including the year 1930. The note to Maurice was fully paid on January 2, 1927. As of January 1, 1927, the unpaid balance of the note to Jesse was $9,077.93. When petitioner moved to Detroit in 1928 or 1929, he owned a house in Denver. The Company took over the house, which was subject to a mortgage which *266 the Company assumed, and allowed petitioner $5,000 for the house, which amount was credited on the note to Jesse as a payment on the unpaid balance of the note. The note to Jesse was paid in full in 1930. By January 1, 1927, petitioner had made payments in the amount of $6,684.98 on his $13,126.88 interest-bearing note to Jesse. The payments consisted of credits to Jesse's personal account for salary earned by petitioner and dividends declared on petitioner's stock. By September 1, 1930, the face amount of Jesse's note, plus interest, was paid in full. Immediately prior to September 1, 1930, petitioner owed Jesse on the note the sum of $12,032. At that time the credit balance in petitioner's personal account totaled $20,016.63. This $20,016.63 consisted almost entirely of salary earned by petitioner, interest on the unpaid balance, and the $5,000 credit given petitioner for his home. After the $12,032 due on Jesse's note was deducted from petitioner's account and credited to Jesse's personal account, the credit balance remaining in petitioner's account was $7,984.63. Prior to the credit of $5,000 given to petitioner for his home on December 30, 1929, the credit balance in petitioner's *267 account totaled $16,358.75. The only withdrawal before payment of the note held by Jesse was an amount of $2,774.27 on February 28, 1931, leaving a balance of $13,584.98 exclusive of the $5,000 credit and subsequent additions. Under the application of the "first-in, first-out rule," the $12,032 payment to Jesse did not use up any of the $5,000 credit given for the home. The home in Denver was purchased in 1922. The purchase price was $7,500. The down payment was one-half of the purchase price. The home was purchased in petitioner's name. At the time the house was purchased, petitioner and his wife had a joint bank account. Petitioner's wife was a housewife. She had no separate income of her own during the period the notes remained unpaid. Petitioner's wife has been a housewife from the time she was married in 1921 throughout the period including the year 1940. Her father is still living. She has not received gifts of money or property during the above period from her father, except that she received wedding presents in 1921 aggregating $2,000, of which $1,000 was given to her by her father. The $2,000 was deposited in a joint bank account of petitioner and his wife in 1921. *268 On February 29, 1932, 38 shares of first preferred stock of the Company and 100 shares of second preferred stock were issued to petitioner as a stock dividend on the common stock in his name. During the years 1932 to 1936, both years inclusive, cash dividends aggregating $5,520 were paid on the preferred stock. In 1936, $13,800 bonds of the Company were issued to petitioner in exchange for the first and second preferred stock, plus a premium of 10 per cent. The bonds were not registered. Dividends were paid in cash on the common stock as follows: 1936
$ 6,000
1937
6,000
1938
5,000
1939
10,000
1940
10,000
1941
10,000
Total
$47,000
In 1936 and 1937, dividends in the amount of $6,000 a year were paid on the 5,000 shares of common stock in petitioner's name. In the income tax returns which petitioner filed for 1936 and 1937, he reported the full $6,000 as his individual income for each year. For the years 1938 to 1940, inclusive, petitioner and his wife filed joint returns. Dividends of $5,000 for 1938 and dividends of $10,000 for each of the years 1939 and 1940 were received from the corporation and reported on the joint returns. Petitioner and his *269 wife have had a joint bank account since their marriage up to and including 1941. All dividend checks for dividends on preferred and common stock of the Company have been made payable to petitioner and he has endorsed the checks, with the exception of the check for $5,000 dated December 22, 1941, which was made payable to Reva Shwayder. Some of the dividend checks were deposited in the joint bank account. Petitioner usually has deposited the checks for his salary and bonus payments in the joint account. Petitioner's wife drew checks on the joint account to pay household expenses. She drew checks in the amount of approximately $3,500 annually to pay household expenses. Petitioner has paid for Government bonds by checks drawn on the joint account. Such bonds were issued payable to Ben A. Shwayder or Mrs. Reva C. Shwayder. Petitioner's salary during the years 1928 to 1936 was $5,200 per annum; it was $7,500 in 1937; it was $10,000 for the three years 1938 through 1940. In 1941 petitioner received a bonus of $20,000 in addition to his salary of $10,000. Petitioner's wife has never voted any of the common stock or preferred stock of the Company; she has never attended stockholders' *270 meetings; and she had never seen any of the stock certificates involved in this proceeding prior to the trial. Petitioner regularly attended stockholders' meetings from 1932 to and including 1941; he has always voted the stock in question and he has never given a proxy to vote the stock to his wife. All transactions involving the stock in surrendering old certificates for new ones were handled by petitioner. At no time have books of account been kept for petitioner's wife. Ultimate findings of fact 1. Petitioner has at all times, including the year 1941, had complete dominion and control over preferred and common stock of the Company all of which was issued to him in his name from 1932 through 1940, and over all of the dividends which were paid on the stock. The dividend of $5,000 which was paid to Reva C. Shwayder on December 22, 1941, was paid to her at the direction of petitioner. 2. Petitioner has never made a gift, assignment or endorsement of any preferred or common stock to his wife during the period from 1924 including the year 1941. 3. Petitioner's wife did not make any contributions in money or property to the purchase of the original 50 shares of Shwayder Company *271 common stock in 1924 or in any subsequent year; she did not make any contribution in money or property to the purchase of any or all of the 50,000 shares of common stock which stood in the name of the petitioner on December 19, 1941, when the dividend of $100,000 was declared. 4. During 1941 and the preceding years back to 1924, petitioner owned 10 per cent of the outstanding common stock of the Company. The $10,000 dividend which was paid in December, 1941 on 10 per cent of the common stock was petitioner's income. Opinion The petitioner reported only $5,000 of the 1941 dividend on the Shwayder Company stock in his income tax return. He and his wife filed separate returns for the year 1941, and his wife reported one-half of the total dividend of $10,000 which was paid. The respondent has determined that the entire $10,000 of dividends is taxable to petitioner under section 22(a) of the Internal Revenue Code. In the petition and in the amended petition the petitioner alleged that in 1923 he and his wife entered into an agrement to purchase stock of Shwayder Bros., Inc. Petitioner, on brief, assets that the question in this proceeding is whether he and *272 his wife purchased the stock in question together. The petitioner relies on John H. Hart, 27 B.T.A. 528; aff'd., 76 Fed. (2d) 864; Herman Gessner, 32 B.T.A. 1258; Walter F. Henningsen, 30 B.T.A. 301; and other cases. Petitioner cites the Hart and Gessner cases as authority for the proposition that "personal property or real property owned by a husband and wife together in Michigan is owned by the entirety and the income is properly treated as the separate income of each and taxable one-half to each." Petitioner contends that this is true under Michigan law regardless of whether the consideration moves from one or both of the spouses. Petitioner's chief contention is that he and his wife had an understanding when they signed the demand notes for the purchase of the Shwayder Bros. stock to the effect that they were purchasing the stock together. He claims that about $2,000 of the wife's funds, received as wedding gifts, went into the purchase of the stock. In brief, petitioner admits that he paid off the notes to a great extent with his earnings, but he argues that this fact in no way invalidated the original agreement to purchase *273 the stock. He contends that the subsequent payments on the demand notes by petitioner involved gifts of money by petitioner to his wife. Respondent does not agree with petitioner's theory that petitioner and his wife purchased the stock together. He contends that the evidence shows that stock was purchased by petitioner as a result of an agreement between him and his two brothers, and that petitioner's wife was not a party to the agreement to purchase the stock. Respondent submits that from the entire record there is no evidence of any weight to indicate that petitioner's wife made any financial contribution in any way towards the payment for the stock, and that, therefore, she could have no equitable interest therein. Respondent points out that Mrs. Shwayder was a minor when she signed the notes and that there is no evidence constituting later ratification by her when she attained her majority. Respondent bases his contention primarily upon the facts relating to the purchase of the stock by petitioner in his name, the paying for the stock by petitioner out of his own earnings, and the possession and control over the stock by petitioner at all times. In short, respondent regards *274 the question here as controlled by Corliss v. Bowers, 281 U.S. 376; Lucas v. Earl, 281 U.S. 111; and Helvering v. Horst, 311 U.S. 112, 115. At the outset it should be stated that petitioner does not establish anywhere in his brief that the incidents of ownership in the stock in question are controlled by the laws of the state of Michigan. Of course, where ownership of property is involved in a general tax question, the local law is to be given effect for the purpose of determining the ownership of property. Commissioner v. Blair, 300 U.S. 5. The dividends in question were paid on stock which was purchased in Colorado and the parties were domiciled in Colorado when the stock was purchased. If this question turned only upon the point of whether petitioner's wife could own property jointly with him under state law, it would be of the utmost importance to recognize that the question would be determined by Colorado law rather than by the law of Michigan. Commissioner v. Porter, 148 Fed. (2d) 566, 569. We do not think, under the circumstances present here, that the question turns solely upon the fact that state law does *275 or does not allow a wife to hold property jointly with her husband. Colorado recognizes that a husband and wife may hold shares of stock as joint tenants. Eisenhardt v. Lowell, 105 Colo. 417; 98 P. (2d) 1001. However, we think it should be observed that tenancies by the entireties no longer exist in Colorado. Wyman v. Johnston, 62 Colo. 461; 163 P. 76. It is somewhat difficult to know exactly what petitioner's contention is with respect to the application of Michigan law to the question. In any event, from the state of the evidence in this case, we are unable to find that the Hart or Gessner cases have the controlling applicability claimed by petitioner. The question, as we see it, is whether petitioner alone, and not jointly with his wife, owned all of the stock of Shwayder Bros., Inc., on which the $10,000 of dividends were declared. See Hughes v. Commissioner, 153 Fed. (2d) 712. Petitioner does not contend that he has ever made a gift to his wife of any of the stock at any time after the original purchase in 1924. Petitioner and his wife repeatedly testified that they purchased the stock together and have always *276 held it in joint ownership. In support of this claim, both stated that the wife signed the notes as a co-maker, thereby evidencing their intention to hold the stock jointly; and that she contributed some $2,000 of her own funds in payment of the stock. One of the first items which serves to refute the claim that petitioner and the wife have always jointly held the stock lies in the record ownership of the stock. Record title to the stock was not taken in the name of petitioner and his wife as husband and wife. Cf. Paul G. Greene, 7 T.C. 142; George K. Brennen, 4 T.C. 1260. Prior to March 10, 1943, (the taxable year in question is 1941), petitioner alone was the record owner of all the shares. Ownership on the books of the corporation may not be essential to the validity of the actual stock ownership, but in the close family situations it is perhaps the best evidence of the state of the title. Marshall v. Commissioner, 57 Fed. (2d) 633; Dulin v. Commissioner, 70 Fed. (2d) 828, 831. Moreover, further evidence that the wife had no proprietary interest in the stock is the fact that petitioner always retained exclusive control and *277 dominion over the stock certificates. See Marshall v. Commissioner, supra. Even the certificate issued in the wife's name in 1943 was never delivered to her and was first seen by the wife at the hearing on this proceeding in 1945. Again, petitioner personally handled all transactions relating to the stock of the corporation. He voted all the stock without proxy from his wife. At no time did she ever vote the stock or participate in any way in the affairs of the corporation. Under such circumstances, the fact that petitioner may have placed the certificates in the joint safe deposit box obviously can give the wife no claim to the shares. George K. Brennen, supra, at page 1269. The real explanation for the wife's signing the notes given in payment of the stock is also entirely consistent with petitioner's sole ownership. Petitioner and the wife testified that she signed the notes because it was intended that she own one-half of the stock. However, despite this testimony the evidence is clear that the wife did not sign because she and petitioner wanted to purchase the property jointly. She signed because petitioner's brothers, who sold him the stock, insisted *278 that she do so. They knew that she was a minor and had no separate estate of her own. But they also knew that her father had agreed to lend petitioner any money which was needed to consummate the purchase of the stock. It appears that although the brothers were willing to take petitioner's demand notes, they still had the wife sign the notes in order to be able more easily to induce her father to give financial assistance in case it was desired. The stock was sold to petitioner solely to induce him to work for the corporation and become a part of the organization. The brothers were not concerned with the rights of petitioner and his wife inter sese. Her signing the notes was no more than an accommodation to the brothers and is no indication whatsoever that at the time of the purchase of the stock in 1924 petitioner and the wife intended to hold the stock in joint ownership. See Estate of Ira L. Berk, 7 T.C. 928. Petitioner's claim that the wife contributed about $2,000 of her own funds to the purchase of the stock and that this furnishes additional support for his conclusion that she became a joint owner of the stock is also refuted by the record. Petitioner admits *279 that the wife did not pay 50 per cent of the purchase price. He submits, however, that joint ownership is not necessarily dependent upon equal contributions from the parties. It is true that in several cases we have held that joint ownership by husband and wife could be established in property even though the consideration given for the property moved from only one of the spouses. See Paul G. Greene, supra; George K. Brennen, supra.But in these cases there was other convincing evidence that the parties really intended to hold the property jointly. As we shall presently demonstrate, petitioner has not shown that any of the wife's separate property ever went into the purchase of the stock. In the absence of other evidence of joint ownership, the lack of any contribution by the wife further supports the view that the parties did not intend jointly to own the stock. On the question of the wife's contribution, the record reveals that the wife received about $2,000 in wedding gifts. Neither petitioner nor the wife possessed a separate bank account at the time of the marriage. They did, however, maintain a joint commercial bank account. The wife deposited the *280 $2,000 in the joint account. A house was purchased for $7,500. Title to the house was taken in petitioner's name only. One-half of the purchase price was paid by funds withdrawn from the joint account. There is no assurance that any of the wife's $2,000 went into the purchase price of the home. Seven years later the house was transferred to a brother of petitioner and payment was made to petitioner by a credit on the books of the corporation to his personal account in the amount of $5,000. Subsequently, payment in the amount of $12,032 was made on one of the notes given in the purchase of the stock. The $12,032 was deducted from petitioner's account and credited to the personal account of his brother. In the pleadings, respondent did not deny the allegation that the house, at a valuation of $5,000, had been applied to the payment of the notes. However, from petitioner's own exhibits, 5, 6, and 7, the book entries in his personal account, it is clear that not only did the credit balance in petitioner's account total well over $5,000 after the deduction of the $12,032, but under the application of the "first-in, first-out" rule, the payment did not use up any of the $5,000 credit given *281 for the home. Respondent's admission in the pleadings as to the application of the house to the payment of the notes is impeached by petitioner's own documentary evidence. In fact, an examination of the notes themselves, which petitioner introduced in evidence, discloses other discrepancies between the payments as alleged in the petition and admitted in the answer and the payments as actually made and recorded on the back of the notes. Under such circumstances, we are not bound by the undenied allegation that the house, at a valuation of $5,000, was applied to the payment of the notes. Paul Herzog, 2 B.T.A. 1139, 1141. Petitioner paid out over $20,000 on the notes, which included the $17,502.50 face amount of the notes, plus 8 per cent interest per annum. Despite the oral testimony and the admission in the pleadings, petitioner's documentary evidence reveals that no portion of the wife's $2,000 ever went into the purchase price of the stock and that more than $15,000 came directly from salary which petitioner did not withdraw from the corporation but turned over to his brothers. Petitioner does not seek to allocate the dividend income to the wife in an amount determined *282 by the proportion her alleged $2,000 contribution bears to the total purchase price of over $20,000. See Max German, 4 T.C. 474. But even if he did, there is no warrant in the record for a finding that the wife contributed any funds of her own in any amount to the purchase of the stock. Petitioner also advances the argument that the wife was always paid one-half of the dividends and that this demonstrates that she was the owner ofone-half of the stock. In fact, the wife testified very definitely that she always received one-half of the dividends. If by this testimony she meant that the dividends were directly made payable to her, the record refutes the claim, since petitioner was always the record owner of the stock to whom all the dividends were paid. Or, if by the testimony the wife meant that petitioner always gave her one-half of the dividends to use as she wished, the record also shows the contrary. Prior to 1932 the wife actually received none of the dividends, since they were all applied to the payment of the notes. In 1932 dividends were declared in preferred stock which was issued in petitioner's name. Although in 1940 some bonds, for which the preferred stock *283 had been exchanged in 1936, were registered in the wife's name, there is no showing that any of the preferred shares had ever been transferred to the wife. The parties testified that in 1937 and 1940 petitioner used some of the dividends to purchase U.S. Savings Bonds in the name of "Ben H. Shwayder or Reva C. Shwayder," and to liquidate a mortgage on the residential home in Detroit which was held in the joint name of himself and his wife. But this use of the dividends does not unequivocally evidence ownership in the wife of any of the stock on which the dividends were declared. It is entirely consistent with the theory that at most petitioner was making a gift to the wife of an interest in the bonds and house. Perhaps what the wife meant by her testimony that she always received one-half of the dividends was that petitioner deposited all of the dividend checks in the joint bank account on which she had the power of withdrawal. Petitioner always maintained a joint bank account in which he deposited all of his income. The wife paid all household expenses with funds withdrawn from the joint account. Neither party considered that she was meeting these expenses with any of her own funds. *284 Petitioner always deposited his salary checks in the joint account and admitted that he never considered that any of his salary ever belonged to his wife. Hence the deposits of the dividend checks by petitioner in the joint account clearly do not signify that any of the dividends actually belonged to the wife as the owner of the stock. See Pedder v. Commissioner, 60 Fed. (2d) 866, 869. The tax treatment of the dividends in years prior to 1941, the taxable year in question, is also very revealing. The years 1938 to 1940, inclusive, are neutral, since joint returns were filed. But in the returns which petitioner filed for the years 1936 and 1937, he reported all of the dividends received from the corporation as his own individual income. Petitioner does not claim any change in ownership of the stock between 1937 and 1941. If the dividends were his in the prior years, they also belonged solely to him in the taxable year. It is held that petitioner alone, and not jointly with his wife, owned all of the stock of Shwayder Bros., Inc., on which the $10,000 dividends in question were declared. Tax consequences must be ascribed to facts as they actually exist and not to other *285 facts which have existence only in the wishful thoughts of petitioner. The determination of the respondent that petitioner is taxable under section 22(a) on the full $10,000 of 1941 dividend income, is sustained. Decision will be entered for the respondent.